IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 18-cv-00348-MEH

GARY SIMMONS,

     Plaintiff,

v.

BELLCO CREDIT UNION, and
JONATHAN T. DOWNEY,

     Defendants.

---

## ORDER ON MOTION FOR SUMMARY JUDGMENT

---

**Michael E. Hegarty, United States Magistrate Judge.**

     Defendants Bellco Credit Union ("Bellco") and Jonathan T. Downey ("Downey") seek summary judgment arguing that the claim brought by Plaintiff Gary Simmons ("Simmons") alleging that Downey was negligent in notarizing a purportedly forged document is barred by the applicable statute of limitations. In the alternative, Defendants contend Simmons has no evidence that Downey deviated from the standard of care required of Colorado notaries, and that any purportedly fraudulent conduct by Simmons' wife was an intervening cause relieving Defendants from liability. Simmons responded to the motion, then filed a motion to supplement his response with additional evidence. The Court concludes that Simmons demonstrates both good cause and excusable neglect to permit him to supplement his response, but Defendants fail to demonstrate a lack of disputed material facts or the existence of undisputed material facts on the present record and, thus, the Court grants Simmons' motion to supplement and denies Defendants' motion for summary judgment.

## <u>FINDINGS OF FACT</u>

     The Court makes the following findings of fact viewed in the light most favorable to

Simmons, who is the non-moving party in this matter.

1.      From at least 2008 onward, Simmons and his wife, Terry Simmons, held a joint checking and savings account with Bellco.[1]

2.      Simmons had an ATM card with Bellco and was a signatory to the joint checking account with Mrs. Simmons.

3.      Simmons had access to both the joint checking and savings accounts with Bellco, including account details, and was able to access the same via Bellco's online banking services.

4.      Mrs. Simmons was employed by Qwest Communications International, Inc. ("Qwest") and its predecessor entities for over 40 years.

5.      Mrs. Simmons participated in a pension plan sponsored by Qwest (the "Plan").

6.      Simmons has not been employed since 2008, and his only income since then has been social security, as well as two years of unemployment benefits.

7.      As of 2009, apart from social security benefits, Mrs. Simmons' pension benefits were the only anticipated source of retirement income for both Simmons and Mrs. Simmons.

8.      Given that Mrs. Simmons' pension would be his primary source of income, Simmons was concerned about his retirement future as early as 2009.

9.      In light of these concerns, Mrs. Simmons discussed the details of her Qwest pension with Simmons as early as 2009.

10.     Specifically, they discussed the amount of savings in the pension, and Mrs. Simmons showed Simmons printouts from Qwest's pension website where she could predict monthly payment amounts depending on when she retired.

11.     Simmons also was able to see the website itself and the information within it when Mrs.

_____

[1]Unless otherwise cited, these facts are stipulated by the parties.

Simmons printed out pension-related information for him in 2009.

12.     Simmons was aware that Mrs. Simmons could potentially elect either a lump sum payment, a single life annuity option, or a joint and survivor annuity option. They discussed these options at that time and surmised that they would elect to receive a joint and survivor annuity after Mrs. Simmons retired.

13.     In April 2010, Mrs. Simmons learned that Qwest would be purchased by CenturyLink, Inc. within the following year. Accordingly, she accelerated her retirement in order to retire under the Qwest banner, preserve her existing benefits, and receive one year's severance pay.

14.     As part of her anticipated retirement, and in light of Qwest's transition to CenturyLink, Mrs. Simmons again discussed her pension options with Simmons in early 2011. Specifically, Mrs. Simmons stated that their options were either a lump sum payout, joint and survivor annuity payments, or a single life annuity option.

15.     In 2011, prior to retiring, Mrs. Simmons represented to Simmons that she would elect the joint and survivor annuity option for pension benefit payments.

16.     On March 22, 2011, Mrs. Simmons submitted her Qwest Pension Plan Benefit Option Election Form (the "Election Form") to Qwest, and chose to receive the single life annuity option. This option provided for pre-tax payments of $5,420.98 per month for Mrs. Simmons' lifetime, with no survivor benefits payable to Simmons after her death. Pretrial Order, 4.IV., ECF No. 37.

17.     The Election Form specifically provided that if Mrs. Simmons did not select a joint and survivor annuity option, then she would have to submit a completed and notarized Spousal Consent to Waive the Joint and Survivor Annuity section of the Election Form.

18.     Mrs. Simmons submitted a signed, notarized Spousal Consent to Waive the Joint and Survivor Annuity form (the "Spousal Consent Form"), dated March 22, 2011.

19.     The Spousal Consent Form contains specific waiver language in which the signer expressly waives joint and survivor annuity benefits that he or she would otherwise be entitled to by law.

20.     The Spousal Consent Form contains what purports to be Simmons' name, social security number, and signature.

21.     The Spousal Consent Form was notarized by Downey, an employee of Bellco.

22.     Defendants did not produce Downey's notary log in their Fed. R. Civ. P. 26(a)(1) disclosures.

23.     Simmons has no personal knowledge of Downey and is unaware of Downey's pattern and practice of notarizing forms while employed by Bellco.

24.     Simmons was and is aware of a notary's obligation to act honestly and to notarize a document only upon proof that the person signing the document is who that person represents himself to be but is unaware of the actual facts and circumstances behind Mrs. Simmons' submission of the Spousal Consent Form.

25.     Simmons took no steps in 2011 to view the actual pension documents Mrs. Simmons submitted at that time—either before or after Mrs. Simmons submitted the same to Qwest. Deposition of Gary W. Simmons, September 26, 2018 ("Simmons dep."), 47: 8-15; *see also* Defs. Ex. L, ECF No. 33-2 (form referenced in Simmons' testimony that was signed and dated January 17, 2010).

26.     Despite knowing that Mrs. Simmons had online access to pension-related information, Simmons never asked Mrs. Simmons for access to online pension information or for any pension materials kept online by Qwest and/or CenturyLink at any time after 2009.

27.     Simmons trusted Mrs. Simmons when she told him that she had elected the joint and survivor annuity option.  Simmons dep. 49: 9-15; 88: 23-25, 89: 1-5.

28.     Mrs. Simmons retired from Qwest on April 18, 2011.

29.     Mrs. Simmons' monthly pension payments were $4,771.91 (after tax).

30.     From May 2011 to October 2016, Simmons was aware of and spent these funds (for his and his family's benefit), which were deposited into his joint checking account at Bellco by the CenturyLink Combined Qwest Pension Fund (the "Fund")—the payor of Mrs. Simmons' pension retirement benefits during that time frame.

31.     Simmons was aware of the income that he and Mrs. Simmons would receive pursuant to her pension as he stated, "we planned on $50,000 to $60,000 annually from the Qwest pension." He agreed that he had an obligation to be aware of the income he was receiving and how that money was being spent during the time he was married to Mrs. Simmons. Simmons dep. 89: 9-13.

32.     The net monthly payments deposited into the Simmons' checking account exceeded the gross monthly payments set forth under the 100% survivorship annuity benefit option ($4,763.69) outlined in the Election Form.

33.     At the time Mrs. Simmons began receiving pension benefits after her retirement, Simmons was aware that single life annuity benefit payments under the Plan were higher than payments for joint and survivor annuity benefits. Defs. Ex. I, ECF No. 30-10 at 1.

34.     Simmons was also aware, as of 2011, that he had a personal financial stake in Mrs. Simmons' pension given his status as her spouse, and that if Mrs. Simmons elected an option other than the joint and survivor annuity option on the Election Form, such an election might have an impact on his long-term financial viability.

35.     However, after the payments began in 2011, Simmons never had any discussions regarding the pension or payments under the same with Mrs. Simmons.

36.     Mrs. Simmons was diagnosed with cancer in February 2016 and passed away on September

16, 2016.

37.     After the cancer diagnosis, Simmons did not inquire into the status of the pension or his rights thereto.

38.     On September 22, 2016, CenturyLink sent Simmons a letter notifying him that Mrs. Simmons' final pension benefit check would be issued on October 1, 2016.

39.     Simmons contested the cancellation of benefits on October 23, 2016, contending that the Election Form and Spousal Consent Form were manipulated in order to deprive him of his interest in Mrs. Simmons' pension.

40.     CenturyLink upheld the claim determination on November 18, 2016, noting in its letter that Simmons "had no questions about [his] notarized signature on the Spousal Consent page."

41.     Thereafter, on or about December 21, 2016, Simmons alleged that he did not sign the Spousal Consent Form.

42.     CenturyLink nonetheless upheld the original claim determination, noting that Simmons did not question the additional $4,198.44 in net benefits received yearly as a result of Mrs. Simmons' single life annuity election, and that the submitted forms (including the Spousal Consent Form) otherwise complied with Qwest's requirements for selecting the single life annuity benefit.

43.     Simmons filed the present lawsuit in the District Court for the City and County of Denver on February 2, 2018.

## **LEGAL STANDARDS**

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a

matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "The moving party may carry its initial burden either by producing affirmative evidence negating an essential element of the nonmoving party's claim, or by showing that the nonmoving party does not have enough evidence to carry its burden of persuasion at trial." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002). Only admissible evidence may be considered when ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c); *World of Sleep, Inc. v. La–Z–Boy Chair Co.*, 756 F.2d 1467, 1474 (10th Cir. 1985).

The non-moving party has the burden of showing there are issues of material fact to be determined. *Celotex*, 477 U.S. at 322. That is, if the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. Fed. R. Civ. P. 56(e); *Scott v. Harris*, 550 U.S. 372, 380 (2007) ("[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.") (citation omitted); *see also Hysten v. Burlington N. & Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002). These specific facts may be shown " 'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence must be generally admissible and...if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, i.e., the evidence must be based on personal

knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). "The court views the record and draws all inferences in the light most favorable to the non-moving party." *Pepsi–Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1255 (10th Cir. 2005).

## ANALYSIS

Defendants argue first that Simmons' negligence claim should be dismissed as barred by the applicable statute of limitations. Second, Defendants contend that Simmons can present no evidence demonstrating Downey deviated from the reasonable standard of care required of Colorado notaries, and that Mrs. Simmons' use of the spousal consent form to commit fraud was an intervening cause relieving Defendants of liability in this case. The Court will address each argument in turn.

## I.    Statute of Limitations

A court may grant summary judgment if the plaintiff's claim is barred by the governing statute of limitations. *Colo. Pool Sys., Inc. v. Scottsdale Ins. Co.*, 317 P.3d 1262, 1273 (Colo. App. 2012) (citing *Olson v. State Farm Mut. Auto. Ins. Co.*, 174 P.3d 849, 860 (Colo. App. 2007)). "But a court cannot grant summary judgment on this basis if there are disputed issues of fact about when the statute of limitations began running." *Id.*

Defendants assert that Simmons' negligence claim is barred by the statute of limitation set forth in section 13–80–102(1)(a), which establishes the period within which tort actions must be brought:

> (1) The following civil actions, regardless of the theory upon which suit is brought, or against whom suit is brought, must be commenced within two years after the cause of action accrues, and not thereafter:

> (a) Tort actions, including but not limited to actions for negligence . . . .

Colo. Rev. Stat. § 13–80–102(1)(a). "[S]tatutes of limitation promote justice by discouraging long delays, prohibiting the prosecution of stale claims, and providing closure to the parties." *Shootman*

*v. Dep't of Transp.*, 926 P.2d 1200, 1207 (Colo. 1996).

In Colorado, causes of action usually accrue when the injured party, by the exercise of reasonable diligence, discovers or should have discovered the injury and its cause. *See Rupnow v. Panio*, No. 16-cv-00813-WJM-MEH, 2017 WL 818664, at *3 (D. Colo. Mar. 2, 2017) (citing Colo. Rev. Stat. § 13–80–108).

> The point of accrual requires knowledge of the facts essential to the cause of action, not knowledge of the legal theory supporting the cause of action. *Murry v. GuideOne Specialty Mut. Ins. Co.*, 194 P.3d 489, 492 (Colo. App. 2008) (citation omitted). "Actual knowledge" is knowledge "of such information as would lead a reasonable person to inquire further." Black's Law Dictionary 888 (8th ed. 2004). Plaintiff is required to exercise reasonable diligence in discovering the relevant circumstances of her claims. Colo. Rev. Stat. § 13–80–108(8). Plaintiff is judged by an objective standard that does not reward denial or self-induced ignorance. *Sulca v. Allstate Ins. Co.*, 77 P.3d 897, 900 (Colo. App. 2003).

*Gargano v. Owners Ins. Co.*, No. 12-cv-01109-CMA, 2014 WL 1032303, at *3 (D. Colo. Mar. 18, 2014); *see also Olson*, 174 P.3d at 854. For purposes of the statute of limitations, "[t]he focus is on a plaintiff's knowledge of facts that would put a reasonable person on notice of the general nature of damage and that the damage was caused by the wrongful conduct of [the defendant]." *Colburn v. Kopit*, 59 P.3d 295, 297 (Colo. App. 2002) (quoting *Peltz v. Shidler*, 952 P.2d 793, 796 (Colo. App. 1997)).

"Whether the statute of limitations bars a particular claim is usually a fact question, but if the undisputed facts clearly show that the plaintiff had, or should have had the requisite information as of a particular date, the issue may be decided as a matter of law." *DerKevorkian v. Lionbridge Techs., Inc.*, No. 04-cv-01160-LTB, 2006 WL 197320, at *10 (D. Colo. Jan 26, 2006) (quoting *Sulca v. Allstate Ins. Co.*, 77 P.3d 897, 899 (Colo. App. 2003)). The interpretation of when a claim accrues under a statute of limitations is an issue of law. *Id.*

In this case, the undisputed facts demonstrate that Mrs. Simmons discussed retirement

options with Simmons in 2009 and, again, in 2011 before she officially retired. Specifically, Mrs. Simmons shared with Simmons the three options—lump sum payment, single life annuity, and joint and survivor annuity—and they agreed to select the joint and survivor option when she retired. However, Mrs. Simmons submitted an election form in March 2011 marked with a choice of single life annuity. Thereafter, she began receiving monthly payments for the single life annuity benefits, which were higher than benefits paid for the joint and survivor annuity. Defendants contend that Simmons knew or should have known at that time (or, at least before the two-year limitation of February 2, 2016) that Mrs. Simmons had chosen the higher benefit payment. Simmons counters that the minor dollar difference between the single life annuity and the joint/survivor annuity is not sufficient to demonstrate that he should have known the monthly payments were actually single life annuity payments. Defendants point to Simmons' own October 23, 2016 letter, addressed to the employer following Mrs. Simmons' death, in which he stated:

> The discussions I had with Terry about her pension plan was for us to sign up for the Joint and Survivor Annuity. With the uncertainty in the stock market, we felt the Lump sum plan was too risky. Since the Single Life Annuity plan only paid more than $700 more per month, the combination of Qwest Joint Survivor option and SSA would allow us to be comfortable with an annual income of $95,000 to $105,000 per year. The extra $8400 per year did not seem to be worth the risk.

Defs. Ex. I, ECF No. 30-10.

The Court finds the letter demonstrates only that Simmons understood in or before March 2011 the differences between the gross amounts to be paid for each retirement option, but it does not establish an undisputed fact that Simmons knew or should have known that the net payments made into the Simmons' joint checking account were for single life annuity benefits, as opposed to joint and survivor annuity benefits. Defendants argue the evidence submitted shows that the net single life annuity payments of $4,771.91 exceeded the gross monthly payments offered for joint and survivor annuity benefits and, therefore, Simmons knew or should have known that the benefits

paid were actually from the single life annuity. However, Simmons attests that he "was not aware at any point from 2011 to 2016 what amount corresponded to the single annuity option or joint and survivor annuity option; the $4,771 per month did not stand out to [him] because [his] wife would have been receiving a monthly pension payment regardless of which option was selected." Pl. Aff., ECF No. 31-3. He also asserts that "[s]ince [he] considered [his] wife's pension payment substantial, whether single or joint, the difference between the two payments was so small it was not noticeable." *Id.* Finally, Simmons attests that he "did not see the pension documents [his] wife submitted in 2011 until Sep. 22, 2016." *Id.* Simmons' testimony is sufficient to raise an issue of fact as to when he knew or should have known that Mrs. Simmons submitted an election form reflecting her choice of the single life annuity retirement benefits.

Defendants further contend that Simmons failed to engage in reasonable due diligence to discover facts giving rise to his claim. Defendants point to Simmons' testimony in which he acknowledged that the retirement benefits would be his sole source of income apart from social security; that Mrs. Simmons chose to retire before Qwest was acquired by Century Link; and that the Simmons' retirement future was uncertain given the sales of the Plaintiff's homes in Arizona and Colorado and the purchase of a retirement home in Arizona. Based on this information, Defendants assert that Simmons understood his wife's "benefit election would have an impact on his long-term financial viability" and even acknowledged that "he had an *obligation* to be aware of the income that he and Ms. Simmons would receive pursuant to her pension." Mot. 12 (emphasis in original). Simmons' testimony, as cited by Defendants, states:

Q:    But what I'm asking is, do you think you had an obligation to be aware of the income you were receiving and how that money was being spent during the time that you were married to your wife?

A.    I guess I do. I mean, and I did. I knew money was coming in. I mean, you get comfortable with things in your life, in my life, the way we lived our life.

> And, you know, we never balanced a checkbook. And we just didn't do it. We
> didn't live like that. So could I have done things different? Yeah. But I just
> don't think that I did anything wrong.

Simmons Dep. 89: 9-20, ECF No. 30-2. Nothing in this testimony nor in the context of the
deposition at that point reflects that Simmons understood the question presented referred to an
obligation to know the difference between single life annuity benefits and joint and survivor annuity
benefits net monthly payments. In fact, the question presented just before the above-cited question
asked Simmons whether he "had an obligation to understand [his] financial condition." *Id.* 88: 16-
21. The Court finds on the present record that a reasonable jury could find that Simmons, although
he had access to the checking account (in which he could simply see the directly deposited net
payments (*see* ECF No. 30-4)) and spent the monthly payments, believed his wife had chosen the
retirement option they discussed, and he was not obligated to discover whether her statements to him
were true. *See* Pl. Aff., ECF No. 31-3 ("I trusted my wife, and assumed she would elect the joint
survivor option because that is what we agreed on.").

In sum, nothing proffered by the Defendants at this stage demonstrates an undisputed fact
"clearly show[ing] that the plaintiff had, or should have had the requisite information as of a
particular date" necessary to establish that Simmons' negligence claim is time-barred.

## II.  Deviation from the Colorado Notaries' Standard of Care

Defendants argue Simmons has conducted no discovery and proffered no evidence
demonstrating that Downey deviated from the standard of care required of Colorado notaries. *See
Trainor*, 318 F.3d at 979 ("The moving party may carry its initial burden . . . by showing that the
nonmoving party does not have enough evidence to carry its burden of persuasion at trial.").
Simmons counters that he did not know, nor was ever physically present with, Downey and the
signature notarized by Downey on the spousal consent form was forged; therefore, Simmons

contends Downey breached his duties set forth in Colo. Rev. Stat. §§ 24-21-505, 506, 507, and 519.

In Colorado, to establish a claim of negligence, a plaintiff must demonstrate the following elements: "(1) the existence of a legal duty to the plaintiff; (2) the defendant breached that duty; (3) the plaintiff was injured; and (4) the defendant's breach of duty caused the injury." *Dolan v. Contemporary Fin. Solutions, Inc.*, 622 F. Supp. 2d 1077, 1082 (D. Colo. 2009) (quoting *Raleigh v. Performance Plumbing and Heating, Inc.*, 130 P.3d 1011, 1015 (Colo. 2006)). "A statute may create a duty that one person owes another, and violation of such statute may constitute a breach of that duty." *Bullock v. Wayne*, 623 F. Supp. 2d 1247, 1252 (D. Colo. 2009) (citing *Scott v. Matlack, Inc.*, 39 P.3d 1160, 1166 (Colo. 2002)).

The statute cited by Plaintiff, known as the Uniform Law on Notarial Acts, was effective July 1, 2018, well after the occurrence of the conduct challenged in this case. *See* Colo. Rev. Stat. § 24-21-503 ("This part 5 applies to a notarial act performed on or after July 1, 2018; *see also Hickman v. Catholic Health Initiatives*, 328 P.3d 266, 268 (Colo. App. 2013), *cert. denied*, 2014 WL 2958780 (Colo. Jun. 30, 2014) ("Generally, [a] statute is presumed to be prospective in its operation. ... merely providing an effective date is insufficient to show retroactive intent, as we presume that a statute 'operates on transactions occurring after its effective date.'") (citations omitted). The governing statute in effect at the time Downey is alleged to have notarized the spousal consent form (March 2011) was Colo. Rev. Stat. § 12–55–110(4),[2] which provided:

> No notary shall sign a certificate or other statements as to a notarial act to the effect that a document or any part thereof was attested by an individual, unless:
>
> (a) Such individual has attested such document or part thereof while in the physical presence of such notary; and

---

[2]The statute was repealed by the Uniform Law on Notarial Acts, Laws 2009, Ch. 180, § 1, eff. July 1, 2018. *Id.*

(b) Such individual is personally known to such notary as the person named in the certificate, statement, document, or part thereof, or such notary receives satisfactory evidence that such individual is the person so named. For purposes of this paragraph (b), "satisfactory evidence" includes but is not limited to the sworn statement of a credible witness who personally knows such notary and the individual so named, or a current identification card or document issued by a federal or state governmental entity containing a photograph and signature of the individual who is so named.

Colo. Rev. Stat. 12-55-110(4) (2017) (subsection (4) added by L. 98 § 2 and effective January 1, 1999). The parties cited, and the Court has found, no authority providing that § 12-55-110(4) creates a legal duty for purposes of a negligence claim. However, Defendants assume for purposes of their motion that a duty is created (Mot. 14) and, thus, the Court will proceed under the same assumption.[3]

According to the governing statute, Downey would have been obligated, in March 2011, to require the individual whose signature was to be notarized to be physically present, and to obtain satisfactory evidence—including a government-issued identification card—that such individual was the person so named. Colo. Rev. Stat. § 12–55–110(4). Despite citing inapplicable law in his brief, Simmons attests:

1.      I did not personally appear in front of Mr. Downey on March 22, 2011.

2.      I have never met Mr. Downey.

3.      I did not sign the Qwest Pension Plan Benefit Election Form . . . and, therefore, the signature purporting to be mine is a forgery.

* * *

8.      I have no knowledge of who actually forged my signature.

ECF No. 31-3. Based on this testimony, Simmons argues "[a] reasonable jury could easily find that

_____

[3]The Court notes that Colo. Rev. Stat. § 12-55-116 provided: "Official misconduct by a notary public liability of notary or surety. (1) A notary public who knowingly and willfully violates the *duties* imposed by this part 1 commits official misconduct and is guilty of a class 2 misdemeanor." *Id.* (emphasis added); *see also People v. Woodford*, 97 P.3d 968, 995 (Colo. O.P.D.J. 2004); *People v. Barringer*, 61 P.3d 495, 500 (Colo. O.P.D.J. 2001).

it was Downey's failure to follow the notary laws that caused Plaintiff's damages, and not the forged signature." Resp. 2. Defendants reply that Simmons' argument is insufficient; rather, Simmons must put forward evidence demonstrating a genuine factual issue as to whether Downey violated his notarial duty(ies).[4] Defendants assert that, under prevailing law, a notary is not obligated to insure the identity of the signer but only to engage in reasonable diligence to ascertain the identity of the signer. They argue that Plaintiff has proffered no evidence as to whether and how Downey failed to engage in reasonable diligence to ascertain the identity of the individual whose signature he notarized.

The Court disagrees and finds Simmons' affidavit, as well as his expert report concluding that the signature on the Spousal Consent form is a forgery (ECF No. 42-1),[5] sufficient to raise a genuine issue of material fact as to whether Downey breached a duty of care. The statute required that Downey *both* have a signer physically present *and* obtain satisfactory evidence of the signer's identity. Simmons' testimony that he has never met Downey is sufficient evidence to raise a factual issue as to whether Downey failed to have the signer of the Spousal Consent form physically in his presence. The expert report may serve, *inter alia*, to corroborate Simmons' testimony. The Court finds that a reasonable jury could, if they believed Simmons' evidence, conclude Downey failed to have the signer of the Spousal Consent form physically present and to obtain satisfactory evidence of the signer's identity. *See, e.g., Quicken Loans, Inc. v. Downing*, No. 1:10-cv-1565-TWP, 2012 WL 4762411, at *12 (S.D. Ind. Oct. 5, 2012) ("... the undisputed facts indicate that [the notary], in

---

[4]Notably, although not required to do so under a Rule 56 standard, the Defendants have not proffered any testimony nor other evidence demonstrating that Downey did, in fact, meet with Simmons (or any male purporting to be Simmons) or otherwise obtain satisfactory evidence of Simmons' identity at the time Downey notarized the Spousal Consent form.

[5]*See* discussion of Plaintiff's Motion to Supplement Response to Defendants' Motion for Summary Judgment below.

addition to his failure to recognize variances in the signatures and differences in the driver's license photograph and data, failed to detect that Ms. Downing initialed a page of the final loan application with 'SD' (her own initials) instead of 'PW' for her sister's initials.").

Defendants contend that while the issue of whether the signature was a forgery may be a factual issue in this case, it is not material to whether Downey obtained satisfactory evidence, including a government-issued document, demonstrating the signer was the person named on the Spousal Consent form at the time it was signed. Defendants argue that "Simmons has conducted no discovery on this issue, and has presented no evidence whatsoever regarding what Downey did when notarizing the Spousal Consent Form on March 22, 2011 that could constitute a breach of the reasonable standard of care for Colorado notaries." Mot. 15. In support of this contention, Defendants cite cases from other districts purportedly finding that notaries are held to a reasonable person standard and "are not insurers of the truth of the objects that they notarize or the identity of the persons presenting their signatures." *Id.* at 6. However, except for a non-binding 1964 opinion from the New Jersey Superior Court, these cases actually state: "[i]n the absence of statute, a notary is held to the care and diligence of a reasonably prudent man to ascertain the acknowledger's identity, but is not an insurer of the truth of the recitals" of the documents notarized. *See, e.g., Shields v. Reader's Digest Ass'n*, 173 F. Supp. 2d 701, 704–05 (E.D. Mich. 2001) (citing *Manufacturers Acceptance Corp. v. Vaughn*, 43 Tenn. App. 9, 29–30, 305 S.W.2d 513, 522 (1956)); *First Bank of Childersburg v. Florey*, 676 So. 2d 324, 331 (Ala. Civ. App. 1996) (same); *Peltz v. Peltz*, No. M199902299COAR3CV, 2000 WL 1532996, at *2 (Tenn. Ct. App. Oct. 18, 2000) (same).

Here, however, for purposes of the motion, the parties have agreed that a Colorado notary's duties arise from the applicable statute. While it may be true that Colorado notaries also are not

"insurers" of the truth of a signer's identity, Simmons' testimony that he never met Downey and his expert's opinion that the signature is a forgery may demonstrate Downey failed in his duties. Defendants have failed to show that Simmons has not proffered sufficient evidence to raise material questions of fact as to whether Downey breached his duties to have the signer of the Spousal Consent form physically present and to obtain satisfactory evidence of the signer's identity.

## III.    Mrs. Simmons' Conduct as an Intervening Cause

Finally, Defendants argue that Mrs. Simmons act of submitting a purportedly forged Spousal Consent form to Qwest was an unforeseeable intervening cause of Simmons' injuries and, thus, Defendants are not liable for Simmons' damages. Simmons counters that causation is a jury question and Defendants failed to designate Mrs. Simmons as a non-party at fault.

A finding of negligence does not create liability on the part of a defendant unless that negligence caused the plaintiff's injury. *Smith v. State Comp. Ins. Fund*, 749 P.2d 462, 464 (Colo. App. 1987) (citing *City of Aurora v. Loveless*, 639 P.2d 1061 (Colo. 1981)). The causation element of a negligence claim in Colorado is governed by a "'but for' test — whether, but for the alleged negligence, the harm would not have occurred. The requirement of 'but for' causation is satisfied if the negligent conduct in a 'natural and continued sequence, unbroken by any efficient, intervening cause, produce[s] the result complained of, and without which the result would not have occurred.'" *Bolton v. Indus. Claim Appeals Office*, -- P.3d --, 2019 COA 47, ¶ 34 (quoting *White v. Caterpillar*, Inc., 867 P.2d 100, 109 (Colo. App. 1993)). *White*'s "definition suggests that the term ['intervening cause'] is most frequently used to describe an event or action that causes a new injury, thereby interrupting the original negligent party's liability." *Id.*

Thus, "[i]ntervening cause is a negligence concept that relieves a defendant from liability if the intervening cause was not reasonably foreseeable." *Id.* "A defendant's conduct is not a cause

of another's injuries if, in order to bring about such injuries, it was necessary that the conduct combine or join with an intervening cause which also contributed to cause the injuries, but which intervening cause would not have been reasonably foreseen by a reasonably careful person under the circumstances. *Moore v. W. Forge Corp.*, 192 P.3d 427, 436 (Colo. App. 2007).

> '(I)f the intervening cause is one which in ordinary human experience is reasonably to be anticipated, or one which the defendant has reason to anticipate under the particular circumstances, he may be negligent, among other reasons, because he has failed to guard against it. * * *'

> '(O)bviously the defendant cannot be relieved from liability by the fact that the risk, or a substantial and important part of the risk, to which he has subjected the plaintiff has indeed come to pass. Foreseeable intervening forces are within the scope of the original risk, and hence of the defendant's negligence. The courts are quite generally agreed that intervening causes which fall fairly in this category will not supersede the defendant's responsibility.' (citations omitted.)

*Flournoy v. McComas*, 488 P.2d 1104, 1107 (Colo. 1971) (quoting W. Prosser, Law of Torts, s 51 at 311, 312 (3d ed. 1964)). "The issue of causation is ordinarily a question for the jury, but if ... facts are undisputed and reasonable minds could draw but one inference from them, causation is a question of law for the court." *Smith*, 749 P.2d at 464 (citing *Moon v. Platte Valley Bank*, 634 P.2d 1036 (Colo. App.1981)).

In this case, Defendants assert that "[e]ven if Downey acted negligently by notarizing the Spousal Consent Form, Ms. Simmons' affirmative act of submitting the fraudulent Spousal Consent Form to Qwest, which subsequently relied upon the same to approve and pay single life annuity benefits over the course of almost six years, constituted an intervening cause which forms the true basis for Simmons' alleged damages in this case." Mot. 16. They further contend that, "[b]ecause notaries are not insurers or guarantors of the truth or falsity of the instruments notarized, it was not reasonably foreseeable, as a matter of law, for Downey to know or have reason to believe that the form he notarized would be used to perpetuate fraud." *Id.*

The Court finds the intervening cause in this case is not necessarily Mrs. Simmons' purported intention to commit fraud, as suggested by Defendants, since it was not an intention to commit fraud that induced Qwest to pay Mrs. Simmons single life annuity benefits rather than joint and survivor annuity benefits.[6] Instead, the intervening cause would have been Mrs. Simmons' intention to (and action in) submitting the Spousal Consent form to Qwest with the retirement benefits election form, which induced Qwest to pay the single life annuity benefits. *See Moore v. W. Forge Corp.*, 192 P.3d at 436 ("A defendant's conduct is not a cause of another's injuries if, in order to bring about such injuries, it was necessary that the conduct combine or join with *an intervening cause which also contributed to cause the injuries* . . . .") (emphasis added); *Bolton*, -- P.3d --, 2019 COA 47, ¶ 34 (*White*'s "definition suggests that the term ['intervening cause'] is most frequently used to describe *an event or action that causes a new injury*") (emphasis added).

Nevertheless, whether Mrs. Simmons's submission actually constituted fraud, the question of whether a reasonably careful person in Downey's shoes would reasonably foresee that Mrs. Simmons intended to submit the Spousal Consent form is a factual one not properly resolved under a Rule 56 analysis. If a reasonable jury were to believe Simmons' testimony that he never met Downey and/or that the signature was a forgery, it could also conclude that a reasonably careful notary under the circumstances presented here could reasonably foresee that Mrs. Simmons planned to utilize the Spousal Consent form for its intended purpose of accompanying the retirement benefit election form.

In sum, the Court finds Defendants have failed to demonstrate the lack of disputed material facts or the existence of undisputed material facts necessary to find summary judgment proper in this case.

---

[6]In addition, there is no claim, counterclaim, or third-party claim alleging fraud in this case.

**IV.  Plaintiff's Motion to Supplement Response**

Briefing on the present motion for summary judgment was complete on December 21, 2018.

Simmons asserts that, on the same day, Defendants served a supplemental expert report containing

an opinion as to the authenticity of the signature on the "original" Spousal Consent form; Simmons

then received the original form on December 28, 2018, and supplied it to his expert, who produced

a supplemental report on February 1, 2019.  Simmons attached a copy of his expert's supplemental

report to the present motion seeking an order permitting him to proffer the report as evidence in

support of his response to Defendants' summary judgment motion.  Defendants oppose the request

asserting that the expert report is not material to the issues raised in the motion.

Rule 6(b) of the Federal Rules of Civil Procedure governs the circumstances under which

a court may grant a party an extension of time to perform a specific act:

> (1) In General. When an act may or must be done within a specified time, the court
> may, for good cause, extend the time:
>
> > (A) with or without motion or notice if the court acts, or if a request is made,
> > before the original time or its extension expires; or
> >
> > (B) on motion made after the time has expired if the party failed to act because
> > of excusable neglect.
>
> (2) Exceptions. A court must not extend the time to act under Rules 50(b) and (d),
> 52(b), 59(b), (d), and (e), and 60(b).

Fed. R. Civ. P. 6(b).  Here, Simmons seeks an extension of time to submit evidence after the

deadline for response had expired.

First, as discussed above, the Court finds good cause to permit Simmons to supplement his

response with his supplemental expert report (ECF No. 42-1).  The Court acknowledges that

Defendants dispute whether the signature on the Spousal Consent form is, in fact, genuine and have

retained their own expert to make a determination.  Resp. 3.  However, the Court also concludes that

Simmons' supplemental expert report (if believed) may serve to corroborate Simmons' testimony that he never met Downey (if believed), which raises a genuine issue of material fact as to whether Downey breached a notarial duty under Colorado law.

Second, the Court finds Simmons demonstrates excusable neglect for not submitting the expert report until February 13, 2019. Simmons asserts, without rebuttal, that the expert prepared his supplemental report on February 1, 2019 and the report was served on Defendants on February 7, 2019. Simmons was then obligated to seek Defendants' position on the motion to supplement; accordingly, the Court finds the time necessary to file the present motion on February 13, 2019 reasonable.

Finally, the Court notes that Defendants identify no prejudice, and the Court finds none, that will inure to Defendants with the Court's consideration of the supplemental expert report for its Rule 56 analysis. Accordingly, the Court will grant Simmons' motion to supplement his response.

## CONCLUSION

In this case, Simmons has demonstrated both good cause and excusable neglect to permit him to supplement his response brief; thus, his Motion to Supplement Response to Defendants' Motion for Summary Judgment [filed February 13, 2019; ECF No. 42] is **granted**. In addition, the Court concludes that Defendants have failed to demonstrate a lack of material disputed facts in this case or the existence of material undisputed facts on the present record. Accordingly, Defendants' Motion for Summary Judgment [filed November 19, 2018; ECF No. 30] is **denied**.

SO ORDERED.

DATED at Denver, Colorado, this 18th day of April, 2019.

BY THE COURT:

_Michael E. Hegarty_

Michael E. Hegarty
United States Magistrate Judge